## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DIAMOND KENNEDY**<br>**8449 Bates Drive**<br>**Bowie, MD 20720**<br><br>                              **Plaintiff,**<br><br>                    **v.**<br><br>**ELAINE L. CHAO, Secretary**<br>**United States Department of Transportation**<br>**1200 New Jersey Avenue, SE**<br>**Washington, DC 20590**<br>                              **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)          **Civil Action No. 19-2666**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Diamond Kennedy, by and through her undersigned counsel, brings this civil action against Defendant, the United States Department of Transportation and complains of the Defendant as follows:

## NATURE OF THE ACTION

1.      Diamond Kennedy brings this action against the United States Department of Transportation (hereinafter "Defendant" or the "DOT") for violating her rights under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.) and the Rehabilitation Act (29 USC § 701, et seq.) for subjecting her to sexual harassment, retaliating against her for reporting the unlawful harassment, failing to accommodate her pregnancy related disability, and for unlawfully terminating her because she engaged in protected activity and was disabled.

2.      Plaintiff, a government contractor who was assigned to work at the Federal Railroad Administration, was subjected to sexual harassment by DOT supervisory employee Marc Willis. After she complained about his unlawful harassment, Ms. Kennedy was subjected to retaliation and harassment by Mr. Willis and her Contracting Officer Representative, Yulita O'Neal.  Willis and

O'Neal harassed and purposefully sabotaged Plaintiff, which caused Plaintiff to be placed on an unjustified PIP and then terminated.  In addition, in the weeks prior to her termination, Plaintiff requested a reasonable accommodation for her pregnancy related disability (hyperemesis gravidarum), which was ignored by Defendant and served as further unlawful motivation for terminating her.

## PARTIES

3.      Diamond Kennedy (hereinafter, "Plaintiff" or "Ms. Kennedy") is a female resident of the State of Maryland.  Plaintiff was formerly a joint employee of Dynamic-Pro, Inc. (hereinafter "DPI") and the Department of Transportation until her unlawful termination in or around October 1, 2018.  From September 2017 until October 1, 2018, and at all times relevant to this action, Plaintiff was assigned by Dynamic Pro, Inc. (DPI), a private employer, to work as an administrative specialist at the Federal Railroad Administration ("FRA") a subdivision of the Department of Transportation ("DOT").

4.      Defendant Elaine L. Chao is the Secretary of the Department of Transportation (DOT).  Plaintiff brings suit against Ms. Chao in her professional capacity under 28 U.S.C. 1391(e)(1).

5.      At all times relevant to the Complaint Plaintiff was a joint employee of the DOT and DPI.  Both entities exercised control over Plaintiff's performance and the terms and conditions of her employment.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to adjudicate the claims asserted in this Complaint pursuant to 42 U.S.C. § 2000e-5(f)(3) of the Civil Rights Act of 1964 and 29 U.S.C. 794a of the Rehabilitation Act (read in conjunction with 42 U.S.C. § 2000e-5(f)(3)).

7.      Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2), because all, or a substantial part, of the events or omissions giving rise to this Complaint occurred in this District.  Additionally, venue is also proper under 42 U.S.C. § 2000e-5(f)(3) of the Civil Rights Act of 1964 and 29 U.S.C. 794a of the Rehabilitation Act (read in conjunction with 42 U.S.C. § 2000e-5(f)(3)), because the unlawful employment practices complained of occurred in this district.

## ADMINISTRATIVE EXHAUSTION

8.      Plaintiff has exhausted her administrative remedies. Plaintiff made contact with an EEO Counselor for the DOT on July 24, 2018 to report she was experiencing sexual harassment from DOT employee Marc Willis.  Plaintiff contacted the EEO Counselor again on August 30, 2018 to report that her Contracting Officer Representative (COR), Yulita O'Neal, was subjecting her to retaliation and harassment as a result of complaint against Willis.  Following Plaintiff's complaint about retaliation she again made contact with an EEO counselor on September 28, 2018 to report that Defendant was refusing to engage in the interactive process regarding her request for a reasonable accommodation for her pregnancy related disability.   Finally, Plaintiff made contact with an EEO counselor on October 25, 2018 to report that she was terminated by Defendant in retaliation for her protected activity against Willis and O'Neal, because she was disabled and for requesting a reasonable accommodation for her pregnancy related disability.  On that date, Plaintiff requested EEO counseling for her harassment, discrimination, and retaliation claims against Defendant.  The request fell within the 45-day period allotted under 29 C.F.R. § 1614.105.

9.      Plaintiff received the Notice of Right to File a Formal Complaint on February 7, 2019, and she filed her formal complaint on February 21, 2019, within the 15-day period provided in 29 C.F.R. § 1614.106.

10.    This lawsuit is filed after the passage of 180 days, measured from the time that the Plaintiff filed her formal Complaint, and no final action has been taken or appeal filed, as provided in 29 C.F.R. § 1614.407.

## STATEMENT OF FACTS

### DOT and DPI were Plaintiff's Joint Employer

11.    Plaintiff was hired by DPI to serve as a contractor for the federal government and was assigned to work at the DOT as an administrative specialist in the Federal Railroad Administration beginning in September of 2017.

12.    While Plaintiff was officially hired by DPI she was required to pass a federally mandated background check to work for Defendant.

13.    Plaintiff supervisor at DPI was Michael Perez, the company's Business Operations Director.   During the time she was assigned to work at DOT, Ms. Kennedy was supervised by Department of Transportation employees.  At the DOT, Ms. Kennedy was initially assigned to work for Patrick Warren, the Acting Administrator of the FRA.  Plaintiff later was assigned to assist FRA employees Christopher Hess and then Rebecca Pennington, in that order.

14.    While Plaintiff was assigned as an administrative specialist for Patrick Warren and Christopher Hess, she received her work assignments directly from these individuals.  While working for Mr. Warren, Plaintiff performed various tasks including organizing a daily morning meeting he held with high level staff, preparing materials he needed for his meetings with various officials, taking meeting notes, and following up with participants about their progress on various agency projects.  Plaintiff also served as Mr. Hess's scheduler and arranged his travel.

15.    After Ms. Kennedy was assigned to work for Ms. Pennington, she began receiving her assignments directly from her newly assigned COR, Yulita O'Neal.  This was unlike her previous posts wherein Ms. Kennedy worked directly with her supervisor.

16.     Prior to seeking a reasonable accommodation and retaliating against her (as discussed in further detail below), Plaintiff spoke with her DPI supervisor, Michael Perez, on average once a week by phone to touch base.  Perez was not responsible for Ms. Kennedy's daily assignments.

17.     At all times relevant to the allegations in this Complaint, any disciplinary actions concerning Ms. Kennedy were instituted by DPI but at the direction of Defendant.  Likewise, Plaintiff's performance was technically evaluated by DPI but DOT was the source of most or all of the feedback on Plaintiff's work.

18.     Ms. Kennedy reported to work daily at Department of Transportation, located at 1200 New Jersey Avenue, SE, Washington, DC 20590.

19.     Plaintiff's DPI supervisor, Michael Perez, did not work on site at the DOT.

20.     Plaintiff's workspace was provided to her by Defendant.  The DOT issued Ms. Kennedy a desk and provided her with a computer.  When she began working for Rebecca Pennington, Plaintiff was also designated her own cubicle in which to perform her duties.

21.     Plaintiff's work hours were fixed by the Defendant.  Ms. Kennedy submitted proposed hours to her Contracting Officer Representative for approval without the involvement of DPI.  If Plaintiff wished to alter her hours, she submitted a request to her DOT COR and not to DPI.

22.     In order for Ms. Kennedy to obtain leave, she had to first request approval from her DOT supervisor before she could request leave from DPI.

23.     DPI had the official authority to terminate Ms. Kennedy, but Marc Willis and Contracting Officer Representative, Yulita O'Neal, had substantial influence in deciding which contractors were assigned to work in her department at the FRA.

**Marc Willis Immediately Began to Sexually Harass Ms. Kennedy**

24.     When Ms. Kennedy began working at the FRA in September of 2017, she initially reported to the Acting Administrator for the FRA, Patrick Warren.

25.     During her first week of employment, Ms. Kennedy was approached by two of her new co-workers, Ashanti Jordan and Perrin Bradley.  They warned Ms. Kennedy about Marc Willis, the FRA's Public Relations Supervisor.  They described Mr. Willis, who is married, as a known "predator" and told Ms. Kennedy that Mr. Willis was "really going to like her" because she was his "type."  They also informed Ms. Kennedy that she should expect Mr. Willis to "hit on" her.

26.     Their warnings came true because shortly after Ms. Kennedy first learned about Willis, he began his inappropriate and unlawful conduct by openly ogling Ms. Kennedy with a particular focus on her posterior whenever she walked by.  He would laugh and shake his head in apparent enjoyment of her appearance.  He asked Ms. Jordan if Ms. Kennedy was a stripper based on the shape of her body.

27.     Notwithstanding Willis's inappropriate behavior, Ms. Kennedy thrived in her new role, which did not go unnoticed.  In November of 2017, Perez, Plaintiff's supervisor at DPI, asked Ms. Kennedy to transfer into a new position because someone had specifically requested that she be assigned to work for him based on her performance and work ethic.  At first, Plaintiff was reluctant because she thought that this position would be as an assistant to Willis.  She was under this incorrect impression because Mr. Willis told her on several occasions that he would ensure that Ms. Kennedy would work for him directly and replace his current executive assistant.  After she learned that the position entailed working directly for Christopher Hess, the FRA's Government Relations Manager, she immediately agreed to the transfer and began working for Hess on November 20, 2017.

28.     Although she would not be reporting to Mr. Willis, Plaintiff's new position put her in closer proximity to him because they now worked in the same office suite along with Mr. Hess and Antoinette Jensen, who was Mr. Willis's assistant.

29.     Mr. Willis was openly displeased that Ms. Kennedy was assigned to work for Mr. Hess instead of him.  Wills told Ms. Jensen that Mr. Hess only wanted Ms. Kennedy as his assistant because of her "body."

30.     After her reassignment, Mr. Willis continued his sexual harassment of Ms. Kennedy. Between November 2017 and July 2018, Willis sexually harassed and subjected Plaintiff to a hostile work environment based on her gender.  His conduct included, but is not limited to:

a.  Telling Plaintiff that she was pretty and that if he was younger, he would date her.

b.  While Ms. Kennedy was chewing gum, Mr. Willis asked for a piece of gum and stated he needed a piece as well because he didn't know when she would ask for a kiss from him.

c.  On Fridays, the DOT permitted workers to wear jeans.  When she wore jeans on Fridays, Mr. Willis would often make inappropriate sexually charged comments regarding her appearance like telling Ms. Kennedy that he really liked the way she looked in her jeans.

d.  Ms. Kennedy was printing a large print project and Mr. Willis walked over and asked her if he could get in front of her to print.  She jokingly said "it will cost you" in a non-sexual manner.  Mr. Willis then replied, "I'm willing to pay for certain things." It was clear to Ms. Kennedy and to a reasonable person that Mr. Willis's statement was intended to be a sexual innuendo and it made Ms. Kennedy visibly uncomfortable.

e.   Ms. Kennedy came into work late because she was ill.  She happened to have red splotches on her neck.  Mr. Willis said, "I know why you were late today" and Ms. Kennedy said, "it's because I was sick."  Mr. Willis told her, "No it's not because you were sick, it's because of those red marks on your neck, I'm really jealous of how you got those red marks on your neck."

31.   Ms. Kennedy became so uncomfortable with Willis's inappropriate behavior, she did whatever she could to avoid him in the office.

32.   Ms. Kennedy was afraid to report Mr. Willis's behavior to the DOT and/or DPI because Willis regularly threatened Plaintiff that she was a contractor and could be terminated at any time, implying that he had the power to terminate her by complaining about her to DPI.

33.   Mr. Willis told Ms. Kennedy that a contractor in their offices would be let go because Chris Hess "doesn't do shit" and did not need an assistant. He assured Ms. Kennedy she did not have to worry because he would protect her. He told Ms. Kennedy that most likely his own assistant, Ms. Jensen, would be terminated and then Plaintiff would become his assistant.   Ms. Kennedy was distraught: she would either lose her job or have to agree to work with the same supervisor who was sexually harassing her.

34.   Shortly after, in June 2018, Ms. Kennedy emailed Chris Hess to request a meeting. During the meeting, she informed Mr. Hess about Willis's derogatory comments towards him.  She also asked if someone was to be terminated and if she would still be able to work with him.  Mr. Hess assured Ms. Kennedy that he would protect her and find a way for her to stay in her position. Ms. Kennedy did not tell Mr. Hess about the sexual harassment from Mr. Willis because she was concerned about losing her job.  Ms. Kennedy feared retaliation based on Mr. Willis's repeated threats that she could be fired at any time.

35.     On Friday, July 13, 2018 Mr. Hess approached Ms. Kennedy and informed her that he had reached an agreement with Mr. Willis to keep Ms. Kennedy as his assistant but, as part of the agreement, Ms. Kennedy would need to work part-time for Mr. Willis.  Mr. Willis was requiring that Ms. Kennedy report to work at 7:30 am to pull media clips for him.  This was earlier than Ms. Kennedy's usual arrival time and meant that she would be alone or nearly alone with Mr. Willis in the office for the first part of the day.  Ms. Kennedy reluctantly agreed and was set to start working for both Mr. Willis and Hess on the following Monday, July 16, 2018.

36.     However, on July 16, 2018, Ms. Kennedy arrived to work and discovered that she had been reassigned to work for the Chief Financial Officer of the FRA, Rebecca Pennington.

37.     As part of her reassignment, Ms. Kennedy was required to report to a new COR named Yulita O'Neal, who worked in the CFO's office.  O'Neal and Willis were close friends and were often seen socializing with each other.

38.     Typically, DPS employees would only contact their COR if they were going to arrive late to work or needed to be out of the office and/or telework.  This was the case when Ms. Kennedy was assigned to work for Messrs. Warren and Hess.  In her new role supporting Ms. Pennington, this changed.  Ms. O'Neal assigned all of Ms. Kennedy work.

**Plaintiff's Initial EEO Activity and the Resulting Retaliation from O'Neal**

39.     Shortly after her reassignment, Ms. Kennedy confided in Antoinette Jensen (Willis's assistant) about Mr. Willis's sexual harassment and threatening behavior.  Ms. Jensen encouraged Ms. Kennedy to report his behavior to the DOT's Equal Employment Office ("EEO").  Ms. Kennedy was afraid of losing her job but with Ms. Jensen's support, she felt that she could file a complaint.  Plaintiff also felt safe enough to file a complaint because she was working in a new department, away from his influence, or so she thought.

9

40.     On July 24, 2018, Ms. Kennedy went to the EEO to report sexual harassment from Mr. Willis.  Ms. Jensen accompanied her.

41.     At the EEO office, Ms. Kennedy met with the EEO Program Manager, Shandra Whiting.  Ms. Whiting told Plaintiff that she would speak with Mr. Willis about the inappropriate behavior, but she would keep Ms. Kennedy's identity confidential. In other words, Ms. Whiting assured Plaintiff that she would remain anonymous.

42.     After Ms. Whiting spoke to Mr. Willis, Plaintiff noticed a significant change in Willis's attitude toward Plaintiff.  Mr. Willis became withdrawn and went out of his way to avoid interacting with Plaintiff even with respect to work-related issues.  While the reduced interaction with Mr. Willis was welcomed, Plaintiff feared that Willis knew that she was the source of the complaint.  Plaintiff's suspicion was later confirmed when Ms. Whiting told her that when she spoke with Willis, he identified Plaintiff as the source of the complaint against him.

43.     Prior to Ms. Kennedy engaging in protected activity, she had a good working relationship with her Ms. O'Neal.  Shortly after Ms. Kennedy complained about Willis, there was an uncomfortable interaction that made Plaintiff realize that Ms. O'Neal was aware of her complaint against Willis.  What was more telling was that after Ms. Kennedy made her complaint, her positive relationship with O'Neal turned negative based, upon information and belief, on Ms. O'Neal's close relationship with Mr. Willis:  Ms. O'Neal began retaliating against Ms. Kennedy, harassing her and subjecting her to unlawful discrimination.

44.     O'Neal's harassment, discrimination and retaliation took the form of unjustified criticism of Ms. Kennedy's work performance, sabotage, and, in conjunction with DPI, a refusal to accommodate Ms. Kennedy's pregnancy-related disability.  These acts of harassment, discrimination and retaliation included, but are not limited to:

a.  Ms. O'Neal and Mr. Willis would, on numerous occasions, walk by Ms. Kennedy in
    the hall and laugh out loud in an overly boisterous manner to create a hostile work
    environment and to signal to Ms. Kennedy that her complaints were laughable and
    that the two of them were above reproach.

b.  Ms. O'Neal criticized Ms. Kennedy for trivial issues, like, for example, not
    responding "ok" to calendar updates.  O'Neal reported this alleged issue to DPI
    even after Ms. Kennedy began responding "ok" to all of Ms. O'Neal's calendar
    invites.

c.  Ms. O'Neal also would repeatedly criticize Ms. Kennedy for how she positioned her
    computer screen.  When Ms. Kennedy would step away from her desk, O'Neal
    would move her screen in order to harass her as there was no business justification
    for having her screen positioned one way or the other.

d.  Ms. Kennedy became pregnant in the Spring of 2018 and informed Ms. O'Neal of
    her pregnancy when she was transferred to work for the CFO.  Ms. Kennedy
    suffered from a pregnancy related disability called hyperemesis gravidarum, which is
    a severe type of morning sickness.  Ms. Kennedy would experience severe bouts of
    nausea, vomiting and dizziness which caused to her to take longer than usual
    bathroom breaks.  Ms. O'Neal was aware of Ms. Kennedy's disability, yet she
    repeatedly complained to Plaintiff and others about Ms. Kennedy spending too
    much time in the bathroom and being away from her desk.

e.  Ms. O'Neal complained and refused to grant Ms. Kennedy's requests for training on
    a software program called PRISM, which Ms. Kennedy was required to be familiar
    with as part of her new position.  This affected here ability to do her job successfully.

f.   Ms. O'Neal would criticize Ms. Kennedy for failing to complete assignments in a timely manner without giving Ms. Kennedy any deadlines for said assignments.

g.   Ms. O'Neal intentionally set up Ms. Kennedy up to cause her to violate department policies in order to support her termination.   Specifically, O'Neal instructed Ms. Kennedy to speak with department employees and inquire if any of them needed calendars to be ordered on their behalf.   Ms. Kennedy compiled the information and provided the number and type of calendars requested to Ms. O'Neal.   Ms. O'Neal told Ms. Kennedy to set up the purchase on her computer and that she would bring the credit card over when Ms. Kennedy was ready to make the transaction.   Ms. Kennedy put everything in the online shopping cart and asked Ms. O'Neal to come over to bring the credit card.   Before Ms. Kennedy made the purchase, Ms. O'Neal told her to add some additional calendars to the order.   This put the bill above what had previously been approved by the Fund Administrator. Because Ms. Kennedy made the purchase, it appeared that she had exceeded the approved amount, even though she was just following O'Neal's instructions.   Ms. O'Neal falsely blamed the excessive order on the Plaintiff.

h.   On another occasion, Chris Hess called Ms. Kennedy into his office and asked her to make a binder for the FRA Administrator to take to Capitol Hill.   Mr. Willis was in or around Hess's office and heard the conversation.   Following the exchange, Mr. Willis went to Ms. O'Neal and told her that Plaintiff had been scheduling travel for Hess, which she was allegedly not permitted to do under the contract with DPI, which led to disciplinary action.

45.   Prior to engaging in protected activity, Ms. Kennedy had enjoyed positive reviews and accolades for her work performance.   Now it was clear that Ms. O'Neal was retaliating against

her for complaining to the EEO regarding Mr. Willis.  Ms. O'Neal wanted Plaintiff fired and/or she

wanted to create a hostile environment based on her protected activity that would cause Plaintiff to

resign.

46.     O'Neal's tactics were successful because DPI was interested in preserving its

relationship with Defendant above all else and was willing to join in DOT's unlawful conduct in

order to keep its contract with DOT.

47.     Mr. Perez, who was Ms. Kennedy's supervisor at DPI, met with Ms. Kennedy on

July 24, August 20, and August 30, 2018 to discuss Ms. O'Neal's criticisms and false accusations.  At

the August 30, 2018 meeting to discuss the binder/scheduling travel incident with Hess, Ms.

Kennedy explained that the accusations by O'Neal were demonstrably false.   Plaintiff presented Mr.

Perez with an email from Mr. Hess which disproved the false claim that Plaintiff was helping to

arrange Mr. Hess's travel.  Plaintiff also told Perez about the sexual harassment from Mr. Willis, her

complaint about Willis to the EEO, and all the retaliation she was experiencing from Ms. O'Neal

because of her protected activity.  Ms. Kennedy also requested to be transferred to a new position

away from Willis and O'Neal.

48.     Mr. Perez informed Plaintiff that Ms. O'Neal's conduct was not sufficient proof of

retaliation.  Perez then informed Plaintiff that Ms. O'Neal was calling for her termination, but that

DPI was supposedly fighting to have her stay on at the FRA because she was highly rated in her

previous postings and had received nothing but accolades for her performance.  Perez told Ms.

Kennedy that DPI's Human Resources (HR) department would reach out to Plaintiff regarding her

request for a transfer, however, upon information and belief, DPI never intended to address Ms.

Kennedy's complaints or her request to transfer.   In fact, DPI's HR department never even

contacted Plaintiff.  Instead, DPI began setting Plaintiff up for her termination as evidenced by the

fact that on the very same day as the August 30, 2018 meeting with Perez where he was informed of

Plaintiff's protected activity, he sent Ms. Kennedy an email informing her that she would be placed

on a Performance Improvement Plan (PIP).  The PIP provided that if her alleged performance

deficiencies were not rectified within 30 days, Ms. Kennedy would be terminated.

### Plaintiff Complains about Ms. O'Neal's Retaliation and Requests a Reasonable Accommodation based on the Advice of the EEO Counselor

49.     Ms. Kennedy went back to Defendant's EEO office on or about August 30, 2018 to

file a retaliation complaint against Ms. O'Neal.

50.     Ms. Jensen again accompanied Plaintiff and they again met with Shandra Whiting.

During this meeting, Ms. Kennedy detailed the many acts of retaliation by Ms. O'Neal, including

how Ms. O'Neal repeatedly criticized her for her pregnancy related medical issues.  Ms. Whiting

explained to Plaintiff that she had a pregnancy related disability .  She advised Plaintiff to request an

accommodation based on that disability.  Ms. Whiting instructed Ms. Kennedy to draft an

accommodation request and send it to DPI (through Mr. Perez), Ms. O'Neal, and herself.  Ms.

Kennedy did as instructed and in her email to Perez, O'Neal and Whiting, she requested two

accommodations: (1) to sit at a desk closer to the bathroom; and (2) the ability to telework when her

hyperemesis flared up.

51.     Upon information and belief, Defendant DOT in coordination with DPI, refused to

meaningfully address Plaintiff's request for accommodation.  Defendant's refusal to accommodate

Plaintiff or engage meaningfully in the interactive process was done in retaliation for Plaintiff's

complaints to the EEO and for exercising her rights to request a reasonable accommodation under

the Rehabilitation Act.  Defendant never intended to accommodate Plaintiff and instead aimed to

drive her to resign.

52.     Mr. Perez engaged in delay tactics on behalf of Defendant.  From time to time, Mr.

Perez would send Ms. Kennedy an email indicating that a decision was forthcoming about her

accommodation requests, but no progress was ever made.  Mr. Perez told Ms. Kennedy repeatedly

that the ultimate decision about the accommodations was out of his hands.  He explained that Ms. O'Neal had to find Ms. Kennedy a new desk and approve her request to telework when her condition flared.  On around September 10, 2018, Ms. Kennedy received an email from Perez indicating that DPI had made progress on her accommodation requests.  He told Ms. Kennedy that the FRA would move her to a desk closer to the bathroom and provide her with the option to take five-minute breaks during the day to go outside and get some air to combat her hyperemesis.  Ms. Kennedy emailed him back to say that she was frustrated about the lack of progress and that five-minute breaks was not a sufficient substitute for the ability to telework when her condition flared up.  Even though Perez indicated that she could move to a desk closer to the bathroom, this never occurred.

53.     Ms. O'Neal continued to retaliate against Ms. Kennedy based on her protected activity and discriminate against her based on her pregnancy related disability.  On September 12, 2018, Ms. Kennedy emailed Mr. Perez: "At this point I feel really singled out by my COR.  It may be caused because her relationship with who I reported to EEO (because once again they are friends here.).  Everything I do is an issue…At this point I feel she is nit picking and finding every reason to try to have me terminated."  Ms. Kennedy again requested that DPI transfer her to another position.

54.     Mr. Perez told Plaintiff for a second time that she had not provided him with sufficient examples of retaliation.  Perez wrote, "I hope you can understand I can't go to FRA and make the claim that they are nitpicking on you because of your complaint without evidence."

55.     Ms. Kennedy was distressed by Mr. Perez's apparent lack of concern and replied via email: "once again I need to be moved as soon as possible because this is stressful and I am scared at this point I will miscarry my child due to the fact of her constant issue with everything. I go home crying and stressed every single day."

56.     On September 28, 2018, Plaintiff received another email from Mr. Perez indicating that her accommodation requests still had not been approved.  Ms. Kennedy told Perez that she did not understand why the accommodation requests were taking so long given that there were five empty desks by the bathroom and that other coworkers were permitted to telework.

57.     In frustration, Ms. Kennedy went to speak with Ms. Whiting again on September 28, 2018 to inquire about Defendant's lack of progress on her reasonable accommodation.

58.     Three days later, on Monday, October 1, 2018, Perez sent Ms. Kennedy an email asking her to call him.  She called him right away and he told her she was not a "good fit for the position" and that she was terminated.  Upon information and belief, DPI and Defendant DOT purposefully did not act on Plaintiff's request for a reasonable accommodation because they knew all along that they planned to terminate Plaintiff at the expiration of the PIP.  Indeed, Plaintiff was terminated exactly 32 days after she received the unwarranted PIP.

59.     Following their teleconference, DPI sent Ms. Kennedy correspondence which falsely claimed that Plaintiff's position was discontinued due to "contract changes" by the Federal Railroad Administration.  In truth, Plaintiff's termination was carried out at the insistence of Defendant in retaliation for her EEO activity and for making a request to accommodate her pregnancy-related disability.

## COUNT I:
## Hostile Work Environment Based on Gender

60.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

61.     Under the Civil Rights Act of 1964 it is unlawful to discriminate on the basis of sex, including to subject individuals to a hostile work environment based on their sex.  *See* 42 USCS § 2000e-16.

62.     Plaintiff is female and was subjected to sexual harassment by Defendant's supervisory employee, Marc Willis, on the basis of her sex.

63.     Willis's acts of sexual harassment included but are not limited to the following: (1) asking Plaintiff's colleague if Plaintiff were a stripper based on her body; (2) ogling Plaintiff's posterior whenever she walked by; (3) telling Plaintiff she was pretty and that he would date her if he were younger; (4) asking her for a stick of gum and explaining he wanted the gum because he did not know when she would ask him for a kiss; (5) telling Plaintiff she looked good in her jeans and making other sexually charged comments regarding her appearance; (6) stating he was "willing to pay for certain things" in a sexual manner to Plaintiff when they were both printing documents; and (7) Suggesting that Plaintiff arrived late for work because sexual activity rather than illness and that he was jealous of how she allegedly got marks on her neck.

64.     The harassment was so severe and pervasive that it affected the terms and conditions of Plaintiff's employment.

65.     Plaintiff informed Defendant's EEO about Willis's ongoing sexual harassment on July 24, 2018.  Defendant did not act on Plaintiff's complaint and instead subjected Plaintiff to retaliation.

66.     As a result of Defendant's unlawful conduct, Ms. Kennedy suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.  She also suffered economic damages resulting from her unlawful termination.

## COUNT II:
## Retaliatory Hostile Work Environment and Termination in Violation of Title VII

67.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

68.     Under the Civil Rights Act of 1964 it is unlawful to subject individuals to a hostile work environment and/or to terminate them based on their protected activity.  *See* 42 U.S.C. 2000e-3(a)

69.     Plaintiff engaged in various forms of protected activity including her complaints to the EEO regarding Willis's conduct and O'Neal's retaliation, request for a reasonable accommodation from Defendant and when she complained to Defendant's EEO in August of 2018 that Defendant was failing to act on her request for a reasonable accommodation.

70.     Defendant created a hostile work environment based on Plaintiff's protected activity when, *inter alia*, Ms. O'Neal lodged numerous unjustified criticisms of Plaintiff's work performance, attempted to have Plaintiff disciplined by falsely claiming that Plaintiff was scheduling travel for Mr. Hess, and had Plaintiff placed on a PIP.

71.     Plaintiff complained about this harassment to Defendant's EEO on August 30, 2018 and Defendant took no actions to remedy the situation.   Instead, due to Plaintiffs' protected activity, Defendant subjected Plaintiff to a hostile work environment and terminated her and/or directed DPI to terminate her.

72.     The harassment was so severe and pervasive that it effected the terms and conditions of Plaintiff's employment.

73.     As a result of Defendant's unlawful conduct, Plaintiff experienced financial harm, including loss of income and loss of future income and emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

## COUNT III:
### Failure to Accommodate Disability

74.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

75.     Under Rehabilitation Act of 1973, 29 USCS § 701, *et seq.*, disabled employees of executive agencies are given the right to request reasonable accommodations, which are defined as, *inter alia*, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an

individual with a disability who is qualified to perform the essential functions of that position."  29 CFR § 1630.2(o)(ii).

76.     An employee qualifies as actually disabled under the Act if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 29 USCS § 705(9) (read in conjunction with 42 USCS § 12102(1)(A)).

77.     The Act defines a major life activity to include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 USCS § 12102(2)(B).

78.     If necessary, when a disabled employee requests a reasonable accommodation the Act requires that the employer engage in an "interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 CFR 1630.2(o)(3).

79.     Plaintiff suffered from a pregnancy related disability called hyperemesis gravidarum, which is a severe form of what is typically referred to as morning sickness.   This condition caused Plaintiff to feel extreme nausea, vomiting and dizziness at various times throughout the day. Common accommodations for women who suffer from hyperemesis gravidarum include permission to take more frequent bathroom breaks, to eat small snacks during work hours, to provide a cot for lying down and to telework when the condition flares up.

80.     Plaintiff alleges her impairment caused her to be actually disabled under the Rehabilitation Act.  This is because she was substantially limited due to her impaired digestive system, which is recognized as one of the major life activities whose substantial limitation qualifies as a disability.  *See* 29 USCS § 705(9) (read in conjunction with 42 USCS § 12102(2)(B)).

81.     Plaintiff requested an accommodation under the Act for her disability.  Specifically, Plaintiff asked that her desk be moved closer to the bathroom so that she would not have to travel a far distance when she felt nauseous and/or the urge to vomit.  She also asked that she be permitted to telework when her condition significantly flared up.

82.     Defendant failed to engage in the interactive process with Plaintiff in good faith and denied her requested accommodations and terminated Plaintiff prior to effectuating her accommodation requests.

83.     Due to Defendant's failure to engage in the interactive process and accommodate Ms. Kennedy, she continued to suffer symptoms related to her condition without any relief whatsoever.  In addition, during the time that Defendant was purportedly considering her accommodation request, Ms. O'Neal continued to harass Ms. Kennedy including chastising her for her use of the bathroom, which was necessitated by her disability.

84.     As a result of the denial of accommodation, Plaintiff experienced financial harm, including loss of income and loss of future income.  Plaintiff also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

## COUNT IV:
### Retaliation for Requesting a Reasonable Accommodation

85.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

86.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-3(a) and 29 USCS § 791(f) (read in conjunction with section 42 USCS § 12203) of the Rehabilitation Act of 1973 make it unlawful for an employer like Defendant to retaliate against an employee for requesting an accommodation.

87.     Defendant retaliated against Plaintiff when it terminated her and/or caused Plaintiff's termination in retaliation for requesting a reasonable accommodation in violation of the Rehabilitation Act.

88.     As a result of Defendant's unlawful conduct, Plaintiff was terminated from her position and suffered economic damages resulting from the loss of her employment.  Plaintiff has also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

## COUNT V:
## Gender Discrimination

89.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

90.     Under Title VII of the Civil Rights Act of 1964, discrimination on the basis of sex includes discrimination on the basis of pregnancy and related medical conditions.  42 U.S.C. 2000e(k); 42 USCS § 2000e-16 (extending the protection to federal employees).

91.     Defendant caused Plaintiff to be placed on a PIP and orchestrated her discriminatory termination because of her sex (including that she was a pregnant woman) in violation of Title VII of the Civil Rights Act of 1964, 42 USCS § 2000e-16.

92.     As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages resulting from the loss of her employment.  Plaintiff also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

## COUNT VI:
## Disability Discrimination

93.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

94.     Under the Rehabilitation Act, discrimination on the basis of disability is unlawful. *See* 29 USCS § 701, et seq.

95.     Plaintiff was a qualified individual with a disability under the Rehabilitation Act.

96.     Under the Act a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 29 USCS § 705(9)(read in conjunction with 42 USCS § 12102(1)(A)).

97.     Major life activities include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 29 USCS § 705(9) (read in conjunction with 42 USCS § 12102(2)(B)).

98.     Plaintiff suffered from a pregnancy related disability called hyperemesis gravidarum, which is a severe form of what is typically referred to as morning sickness.   This condition caused Plaintiff to feel extreme nausea, vomiting and dizziness at various times throughout the day. Common accommodations for women who suffer from hyperemesis gravidarum include permission to take more frequent bathroom breaks, to eat small snacks during work hours, a cot for lying down and to telework when the condition flares up.

99.     Plaintiff's physical impairment caused her to be actually disabled under the Rehabilitation Act.  This is because she was substantially limited due to her impaired digestive system which is recognized as one of the major life activities whose substantial limitation qualifies as a disability.  *See* 29 USCS § 705(9) (read in conjunction with 42 USCS § 12102(2)(B)).

100.    Defendant placed Plaintiff on a PIP and subjected her to a discriminatory termination because of her disability in violation of the Rehabilitation Act.  *See* 29 USC 791.

101.    As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages resulting from the loss of her employment.  Plaintiff also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Kennedy respectfully prays that this Court enter judgment against Defendant as follows:

a)   enter a declaratory judgement finding that the Defendant violated federal law as specified herein;

b)   enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c)   award monetary and compensatory damages pursuant to Title VII and the Rehabilitation Act in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendant as alleged herein;

d)   award Plaintiff reasonable attorneys' fees and costs incurred in this action;

e)   order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

_____/s/ Sundeep Hora_____
Sundeep Hora (D.C. Bar. No. 472944)
Savanna L. Shuntich (D.C. Bar. No 1034411)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

*Attorneys for Plaintiff*